**In re Thurston and Myrtle MATTOCKS, Debtors.**

**Bankruptcy No. 181–11006–21.**

United States Bankruptcy Court, E. D. New York.

Oct. 9, 1981.

Salzman, Ingber & Winer, New York City, for debtors.

Robert W. Tauber, Brooklyn, N. Y., Chapter 13 Trustee.

CECELIA H. GOETZ, Bankruptcy Judge:

A hearing was held before this Court on July 27, 1981 under 11 U.S.C. § 329 and Bankruptcy Rule 220 to determine the reasonableness of the fees charged the above-named debtors by Salzman, Ingber & Winer ("Salzman"), their attorneys. At such hearing, Harvey Winer, Esq., a member of the firm of Salzman, Ingber & Winer, appeared and was heard. Evidence was also received from the debtors.

11 U.S.C. § 329 expressly authorizes the Court to review all compensation paid, or agreed to be paid, to an attorney for a debtor in connection with a bankruptcy case and to determine the reasonableness of the payment. If the compensation exceeds the reasonable value of such services, the Court may cancel any such agreement, or order the return of any such payment, to the extent found to be excessive. Pursuant to Bankruptcy Rule 220, which continues to be applicable to cases brought under the Bankruptcy Code,[1] the hearing was scheduled by the Court *sua sponte*.

### THE FACTS

1. The debtors, Mr. and Mrs. Mattocks, are the parents of three children whose ages at the time the petition was filed were 13, 16, and 18. Mr. Mattocks is employed as a television repairman; she works as a housekeeper. Sometime prior to December, 1980, they fell behind on the mortgage payments on their home and foreclosure proceedings were initiated on November 17, 1980 by the holder of the mortgage, Federal National Mortgage Association.

2. During the pendency of this foreclosure proceeding, the debtors received a letter from "Midland Equities of New York,

Inc." ("Midland Equities"). This letter, after adverting to the possibility that Mr. Mattocks could lose his home in the foreclosure action, continued:

"We can stop the foreclosure and save your house. We can arrange a plan, that you can afford, that will allow you to continue living in your home and keeping title and ownership to it."

3. The name of the servicing agency used by the mortgagee of the Mattocks' home is Public Equities Corporation, and when Mr. Mattocks received the letter from Midland Equities, he thought it was a communication from the similarly-named Public Equities Corporation.

4. When Mr. Mattocks, in response to the letter from Midland Equities, visited that firm's office, he saw a woman who identified herself as "Shirley Dorf," and told him that "she would work out a plan where I would be able to save my home."

5. Mr. Mattocks gave Mrs. Dorf the papers he had received relating to the foreclosure proceeding, and the summons and complaint, dated November 17, 1980, were evidently later turned over by Midland Equities to the Salzman firm.

6. The same day as Mr. Mattocks first saw Mrs. Dorf, he signed a four-page form document prepared by Midland Equities entitled "Contract for Services." A copy of this document, together with the annexed "Notice Regarding Legal Fees," is appended to this Opinion. Mr. Mattocks agreed, pursuant to this Contract, to retain Midland Equities "to seek and obtain a solution to the mortgage foreclosure suit" in return for a fee of $1,000. This "solution" could take any one of four forms, one of which was "obtaining competent counsel to file a Wage Earn [*sic*] Plan." Both the contract and a supplemental agreement set forth that there would be an additional fee required for the filing of a wage earner plan.

7. A paragraph captioned "Exclusive Term" provided that the appointment of

---

1. The Bankruptcy Code, adopted as part of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 254, was enacted on November 6, 1978 and is applicable to all bankruptcy cases commenced subsequent to September 30, 1979.

Midland Equities "shall be sole, exclusive and irrevocable during the term commencing with the date hereof and continuing for a period of 180 days." The 180 days would have expired around June 26, 1981.

8. Mr. Mattocks has only paid Midland Equities $500 of the $1,000 fee stipulated in the "Contract for Services." Following his retention of Midland Equities, Mr. Mattocks kept calling Mrs. Dorf and "asking her what was taking such a long time. She said she was working out the problems. She said: 'You don't have to worry about that. We have sent the papers over and they will be processed.' The only thing you have to worry about is that you have to make an appearance in court."

9. However, in fact, no court proceedings were initiated on behalf of Mr. and Mrs. Mattocks until March 26, 1981.

10. On February 18, 1981, Mr. Mattocks paid Midland Equities $500 in cash. Sometime during the following week, he received a telephone call from Midland Equities telling him that on March 4, 1981, he was to go to an attorney's office of which they would provide him the address, and that he should take with him $310 in cash to give to the attorneys to whom Midland Equities was referring him.

11. On March 4, 1981, Midland Equities directed him to the firm of Salzman, Ingber & Winer.

12. On arriving at the offices of Salzman, Ingber & Winer, where he was expected, he turned over $310 in cash to an associate of that firm, Alan Goldberg, Esq., who gave him a receipt for the money. The receipt, dated March 4, 1981, recites that there is a balance due of $350.

13. But for the arrears on their mortgage and the contract with Midland Equities, Mr. and Mrs. Mattocks had no debts, except possibly a $50 parking fine, at the time they consulted Salzman, Ingber & Winer. They would have had no need for relief under the bankruptcy laws but for the pending foreclosure proceeding.

14. Mr. Mattocks was interviewed by Norman Ingber, Esq., a partner of the firm, who, in the presence of Mr. Mattocks, called up the attorney for the mortgagee and ascertained the arrearages on the mortgage.

15. The same day, Mr. Mattocks signed a one-page "Contract to Hire Attorney," pursuant to which he retained the Salzman firm to represent him "for all purposes in connection with Chapter 13," and agreed to pay $650 for their services. The contract specifies that appeals are not included, and that no promises or guarantees have been made regarding the outcome of the client's case.

16. The retainer agreement produced by Salzman, Ingber & Winer is dated March 5, 1981, but the Court is satisfied that it was, in fact, signed on March 4, 1981, and that the date of March 5, 1981 was added subsequently. Not only did Mr. Mattocks testify that March 4, 1981 is the date he went to the offices of Salzman, Ingber & Winer and that he did not return there until some weeks later, but both the receipt given him, and the notation on the retainer, reflects that the initial payment on the retainer was made on March 4, 1981.

17. On March 5, 1981, a judgment of foreclosure was entered in the pending foreclosure suit.

18. Not until several weeks after Mr. Mattocks first retained the Salzman firm did that firm, on March 26, 1981, file a petition under Chapter 13 on behalf of him and his wife. The schedules prepared by Salzman, Ingber & Winer for Mr. and Mrs. Mattocks contain no reference to Midland Equities, and the debts listed did not include the balance of $500 apparently due Midland Equities under the "Contract for Services."

19. The proceeding initiated by Mr. and Mrs. Mattocks was assigned to this Judge. On March 31, 1981, I issued an Opinion holding that arrearages under a mortgage could no longer be cured under Chapter 13 after entry of a judgment of foreclosure. *In re Pearson*, 10 B.R. 189, 7 B.C.D. 567, 4 C.B.C.2d 57 (Bkrtcy., B.C.E.D.N.Y.1981).

20. Despite the fact that in light of this decision, the Chapter 13 proceeding filed by

Mr. and Mrs. Mattocks could no longer realize its objective, that proceeding continued to be prosecuted by the Salzman firm and monies continued to be collected from Mr. and Mrs. Mattocks for the firm's services. They were not advised that without an appeal, their plan could no longer be confirmed.

21. On May 18, 1981, contemporaneously with the first meeting of creditors, Alan Goldberg, Esq., a young associate in the Salzman firm, took $200 in cash from Mr. Mattocks. Subsequently, just prior to the confirmation hearing on June 4, 1981, Mr. Goldberg collected another $150 from Mr. Mattocks.

22. At the confirmation hearing held on June 4, 1981, the attorney for Federal National Mortgage Association produced a copy of the judgment of foreclosure entered March 5, 1981. He advised the Court that on the date the petition was filed, on March 26, 1981, the property was being advertised for public sale. Mr. Goldberg, the Salzman associate who appeared on behalf of the debtors, stated that he knew nothing regarding entry of the judgment of foreclosure. Under the authority of the *Pearson* decision, the Court denied confirmation of the plan. The proceeding was not dismissed because the Court desired to retain jurisdiction for the purpose of reviewing the facts regarding the payments made by Mr. and Mrs. Mattocks to Midland Equities and to the firm of Salzman, Ingber & Winer.

23. Mr. and Mrs. Mattocks might have been able to save their home, which is now lost, had the petition for relief under Chapter 13 been filed on behalf of Mr. and Mrs. Mattocks on the date that the Salzman firm was retained.

24. Although the Salzman firm has filed the statement required by Rule 219(b), it has not complied with Local Bankruptcy Rule 10(f). The statement filed by the Salzman firm pursuant to Rule 219(b) describes the services rendered as including "analysis of the financial situation, and rendering advice and assistance to the client in determining whether to file a petition under the Bankruptcy Act."

25. Mr. Winer could not advise the Court how much time his firm had spent on the case; he stated that his firm keeps no time sheets. He subsequently submitted evidence that his firm charges $125 an hour for its services.

26. Mr. Mattocks said he had spent about two hours at the Salzman firm on his first visit, principally with Mr. Goldberg, and a half-hour on his second visit when he signed the typed documents. At the two Court appearances, which probably took less than one hour in total, he was represented by Mr. Goldberg.

27. Mr. Winer stated that Midland Equities has regularly been referring matters to the Salzman firm for approximately ten months. When asked what the business of Midland Equities was, Mr. Winer replied: "I assume that their business is to see if they can get second mortgage financing, or first of all, refinancing with somebody who owns a home, who is in jeopardy of foreclosure." He stated flatly: "We have no connection with this company whatsoever."

28. When Mr. Winer was asked for further details respecting Midland Equities, the following colloquy resulted:

"THE COURT: What do they charge people?

"MR. WINER: As to what they charge people, to be perfectly frank with you, I have no idea. * * * I know that they have a range. I don't know exactly what their range is. I believe it is somewhere between $200 and $700. I don't know exactly how they base their fees or figures like that. They had seen our ad. I think it was in the [*New York*] *Post* when we were advertising and they asked if we would mind if we referred them any Chapter 13s. They have seen we did quite a number of these and we said, 'No, we don't mind.'

"THE COURT: * * * Let me ask you something further. Who is the individual with whom you have had your negotiation at this outfit [Midland Equities]?

"MR. WINER: We don't really have any negotiation.

"THE COURT: When you call up, whom do you ask to speak to?

"MR. WINER: We don't call.

"THE COURT: When they write you or call you, whom do you speak to there?

"MR. WINER: Let's see, Bob—What is his last name? I forget his name. I know the guy, too. Let me see if it's here. I'll call the office; I forget his name. I can get you his name.

"THE COURT: I appreciate if you supply that. Mr. Mattocks obviously consulted Midland Equities.

"MR. WINER: Bob Barrett.

"THE COURT: B-a-r-r-e-t-t?

"MR. WINER: I think it's B-a-r-r-e-t-t."

29. At the opening of the hearing, Mr. Winer made the following statements concerning Mr. Mattocks:

"MR. WINER: He came into our office on March 5, 1981.

"THE COURT: March 5, 1981. At that point, had he filed an immediate proceeding, he would have had the benefit of the stay.

"MR. WINER: On March 5th?

"THE COURT: That's right.

"MR. WINER: The judgment was entered on March 5th.

"THE COURT: The judgment was entered, I'm told—

"MR. WINER: I see a note on our file which says March 5th.

"THE COURT: It was entered on March 5th. The question was whether he didn't come to you before March 5th and whether he didn't come to Midland Equities before March 5th.

"MR. WINER: Your Honor, as to Midland Equities, I can only speak for our firm. Midland Equities, I can't speak for. I have the retainer agreement which indicates when he came to [our] office. He came to our office on March 5th."

30. Mr. Winer's original statement to the Court that Mr. Mattocks came to his law firm on March 5, 1981 was in error. As earlier found, Mr. Mattocks retained Salzman, Ingber & Winer on March 4, 1981, and on that date paid that firm $310.

## DISCUSSION

■ Congress enacted Chapter 13 to aid honest debtors, like Mr. and Mrs. Mattocks, to save their home when threatened by foreclosure proceedings. Section 1322(b)(5) was specifically intended by Congress to apply to mortgage debts. House Report No. 95–595, 95th Cong., 1st Sess. 429 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. *See also* 124 Cong.Rec.H. 11,106 (Sept. 28, 1978); S. 17,423 (Oct. 6, 1978). However, for reasons stated at length in my Opinion in *In re Pearson, supra,* after a judgment of foreclosure has been entered, a Chapter 13 plan, in order to satisfy the Code, must provide for the payment of that judgment in full over the life of the plan. It is no longer enough to pay the arrearages that trigger the judgment. It is the judgment, not the mortgage, that now defines the rights of the judgment creditor.

■ A judgment of foreclosure was entered with respect to the home of Mr. and Mrs. Mattocks on March 5, 1981. From that date forward, it was no longer possible for them through a Chapter 13 plan to save their home by paying off the arrearages over the life of a Chapter 13 plan. The situation was very different when Midland Equities first induced Mr. Mattocks on December 29, 1980 to give it the exclusive right for six months to take care of his problems. There was still time, even as late as March 4, 1981, when Midland Equities, having collected $500, finally referred the matter to the Salzman firm. But it was too late when, some three weeks later, the Salzman firm finally filed a plan on behalf of Mr. and Mrs. Mattocks.

Mr. and Mrs. Mattocks have not only lost their home, but they have been induced to pay out $1,100 for services of no value whatsoever to them. Moreover, had they not been led to believe by those whom they trusted and paid to help them that they were being protected from loss of their home, they might well have taken action that would have saved their home.

The so-called "Contract for Services" into which Mr. and Mrs. Mattocks were induced

to enter by Midland Equities appears unconscionable on its face (U.C.C. § 2–302). The exaction of a commitment to pay $1,000 in return for an obligation which can be discharged by doing no more than referring the other party to attorneys who advertise regularly in the metropolitan newspapers for clients seems clearly to represent overreaching and exploitation by Midland Equities of a naive and trusting debtor. However, Midland Equities is not before the Court at this time; its practices will have to be judged elsewhere. The limited issue with which this hearing is concerned is the reasonableness of the fee charged the debtors by the Salzman firm for filing a substantially useless proceeding.

When Mr. and Mrs. Mattocks first consulted the Salzman firm on March 4, 1981, it was true then, as it is true now, that the law respecting the impact of Chapter 13 on mortgage foreclosure proceedings was in dispute.

On February 11, 1981, Bankruptcy Judge Price had held that the simple acceleration by the mortgagee of the entire mortgage debt cuts off the right to cure a mortgage default under Chapter 13. *In re LaPaglia*, 8 B.R. 937, 7 B.C.D. 333, 3 C.B.C.2d 717 (Bkrtcy., B.C.E.D.N.Y.1981). Later that same month, Bankruptcy Judge Parente intimated that a cure may be attempted up to the time of actual sale of the foreclosed property. *In re Taddeo*, 9 B.R. 299, 7 B.C.D. 422, 4 C.B.C.2d 185 (B.C.E.D.N.Y. 1981), aff'd, Docket No. 81–0892 (E.D.N.Y. Sept. 24, 1981) (Pratt, J.).[2] On March 31, 1981, the undersigned concluded, taking a position somewhere in between, that mere acceleration alone was not decisive, but that after a judgment of foreclosure had been entered, resort to Chapter 13 came too late. *In re Pearson, supra.*

The one element common to all these opinions is recognition that the later the

stage at which resort is had to the bankruptcy court, the more difficult it is to find in Chapter 13 the power to override the state court foreclosure proceedings. This was obvious before a single opinion issued. Clearly, the sooner a debtor applies for Chapter 13 relief, the greater the chance of success.

Accordingly, the Salzman firm should have filed a petition for relief promptly upon being retained by Mr. and Mrs. Mattocks so as to arrest the pending foreclosure proceeding at the earliest possible stage. Had a petition been filed on March 4, 1981, on the date Salzman's firm was retained, Mr. and Mrs. Mattocks might well still be in possession of their house. Instead, the necessary papers were not filed until March 26, 1981, long after the judgment of foreclosure was entered on March 5, 1981.

In many respects, the facts here duplicate those present in *In re Butchman*, 3 C.B.C.2d 377 (B.C.S.D.N.Y.1980). That case also involved Midland Equities. There, after Midland Equities had received a $500 fee, it referred Mr. and Mrs. Butchman to the offices of Gerald A. Kagan, Esq., who mailed a petition under Chapter 13 to the bankruptcy court where it was received two hours after the debtors' residence was sold pursuant to a foreclosure sale. The court pointed out that had the debtors' attorney filed a Chapter 13 petition earlier, the automatic stay provisions would have stopped the foreclosure sale. Judge Schwartzberg, in that case, required Mr. Kagan to remit to the debtors the fee he had received, saying:

"This Court cannot countenance the debtors' attorney's flagrant inattention to his clients' affairs. Having accepted a fee * * * he was duty-bound to represent his client competently, Canon 6, Code of Professional Responsibility, 29 *McKinney's Consolidated Laws*, and zealously within the bounds of the law. Canon, Code of

---

**2.** In *Taddeo*, no final judgment of foreclosure had been entered, so that the statements made respecting the effect of such a judgment were *dicta* and do not appear to have been either adopted, or rejected, by Judge Pratt, who stated the issue in the case to be "whether a debtor who has filed a Chapter 13 petition, after a

mortgagee has accelerated payments but *before a final foreclosure judgment* has been issued, may cure the default under 11 U.S.C. § 1322(b)(5) by paying the arrears under the plan and/or post-petition payments under the original mortgage schedule." (Emphasis supplied.) Slip Opinion, p. 3.

Professional Responsibility, *supra*. He did neither. One entrusted with the legal responsibility for representing the financial affairs of a distressed debtor owes no less a duty to perform his legal services with integrity and zealous competence than the attorney representing an affluent client. A deviation from the highest standards of ethical responsibility in either case should not be condoned."

The Salzman firm did not meet the standards recognized by Bankruptcy Judge Schwartzberg. It failed to give competent representation to Mr. and Mrs. Mattocks. It delayed in filing a petition for relief, and thus lost to Mr. and Mrs. Mattocks the opportunity to save their home. Not only did Salzman fail to act promptly upon being retained, but it likewise failed to monitor the progress of the foreclosure proceeding. In view of the entry of a judgment of foreclosure on March 5, 1980, there was no purpose in continuing to process the Chapter 13 case after issuance of the Opinion in *In re Pearson* on March 30, 1981. Unless Mr. and Mrs. Mattocks were prepared to appeal and pay Salzman for the cost of such appeal, the Chapter 13 proceeding should have been brought to a halt at that point. There was no purpose to be served by requiring the presence of Mr. and Mrs. Mattocks at additional court proceedings, nor did they need legal services in connection with a matter that was now doomed. Nevertheless, not only was the proceeding allowed to continue, but an additional $350 was collected from them by the Salzman firm when, because of the state of the facts and the applicable law, nothing could be accomplished on behalf of Mr. and Mrs. Mattocks by the continuation of the Chapter 13 proceeding. Nothing was said to Mr. and Mrs. Mattocks with respect to the various developments affecting their proceeding.

The Salzman firm's services fell short in another respect. Common prudence dictated that the outstanding contractual obligation to Midland Equities for $500 should have been listed on the debtors' schedules, even if it were deemed disputed. Failure to list it would forfeit the right to have the debt discharged. Since Salzman, Ingber & Winer were aware that Midland Equities charged for their services, the debt should have been discovered and listed in the exercise of ordinary professional competence.

This is not the first time that the Salzman firm has failed to render competent service. In *In re Blackman*, Bankr.No. 880–04191–17 (B.C.E.D.N.Y.1981), a proceeding also brought under Chapter 13, Bankruptcy Judge Radoyevich found, *inter alia*, with reference to Salzman, Ingber & Winer, that they "do not know how to draw an order"; that the "proceedings in this matter were not handled in an intelligent, efficient, or professional manner"; that if the papers submitted to him were being prepared by attorneys, "such attorneys were not only careless, and negligent, but were lacking in knowledge of the law, rules, and practices of this Court." In his view, a fee of $150 per hour "by attorneys who either do not possess the requisite knowledge or skills to handle a Chapter 13 bankruptcy proceeding, or who are too careless, negligent, and inattentive to their clients' problems to properly supervise the proceedings," was grossly excessive. In that case, which, unlike the present one, resulted in a successful Chapter 13 plan, Judge Radoyevich reduced the fee to $400.

In *In re Wilson*, 11 B.R. 986, 7 B.C.D. 1050 (Bkrtcy., B.C.S.D.N.Y.1981), Bankruptcy Judge Schwartzberg, on the application of the standing Chapter 13 trustee and the United States Trustee, reviewed the fee charged by Salzman, Ingber & Winer to the debtor there involved. There, too, the client had agreed to pay $660. In that case, Judge Schwartzberg found that "the debtor's representation by the firm of Salzman, Ingber & Winer was neither competently performed, nor zealously provided." He directed Salzman, Ingber & Winer there to remit all funds received by them in connection with that case and to receive no further compensation from the debtor there involved.

In this case, too, it can fairly be said that "the debtor[s'] representation by the firm of

Salzman, Ingber & Winer was neither competently performed, nor zealously provided." But, there is more to this case than lack of competence. The practices of Midland Equities revealed by this record smack of fraud. The Salzman firm, according to Mr. Winer, for the last ten months has been regularly receiving clients from Midland Equities. According to the "Statement of Services" furnished to this Court by the Salzman firm, one of the services it performed for Mr. and Mrs. Mattocks was to analyze the financial situation of the debtors and render advice and assistance in determining whether to file a petition under the Bankruptcy Code. It would be impossible for any lawyer to inquire into the financial situation of someone situated like Mr. and Mrs. Mattocks and not uncover the circumstances of their dealings with Midland Equities. As has already been pointed out, the debtors' obligations to Midland Equities should have been canvassed to ensure the debtors the full benefit from filing under Chapter 13, which includes the discharge of all pre-petition obligations. Such canvass was the more imperative since the Salzman firm knew that Midland Equities charges substantial fees.

If the Salzman firm has been rendering the services described on the statement filed with this Court, it must necessarily have learned of the unconscionable and inequitable practices of which it has been a beneficiary.

In regularly accepting referrals from Midland Equities, the Salzman firm was engaging in questionable conduct. The Disciplinary Rules sanction cooperation by a lawyer with organizations which promote the use of that lawyer's service only in certain limited circumstances. One of the conditions which must be met where the organization is not connected with a bar association is that "no profit is derived by it from the rendition of legal services by law-

yers." Code of Professional Responsibility, D.R. 2–103, Judiciary Law Appendix. Furthermore, there must be "no interference with the exercise of independent professional judgment in behalf of the client." *Ibid.* Clearly, Midland Equities profitted from the services of Salzman, Ingber & Winer since under its form contract, it earned its fees when they accepted the cases referred to them. And the firm's failure to protect Mr. and Mrs. Mattocks from future claims by Midland Equities for the balance of the fee due under its "Contract for Services" may be the result of the divided loyalties that acceptance of business as a regular matter from Midland Equities was bound to produce.

This Court would be remiss in its obligation to preserve the rectitude of the proceedings before it if it permitted the Salzman firm to retain fees which it has collected in connection with the questionable operations of Midland Equities. The Court of Appeals for the Second Circuit has recently had occasion to remind both the bench and the bar that attorneys for debtors in bankruptcy proceedings are "officers of the court and fiduciaries." *In re Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 943 (2d Cir. 1979); *In re Futuronics Corp.*, 24 C.B.C. 417, 655 F.2d 463 (2d Cir. 1981). And that where attorneys fail to live up to their obligations as such officers and fiduciaries, all fees received by them should be required to be returned, with interest. *In re Arlan's Dep't Stores, Inc., supra.*

For the reasons stated, the Court is directing the firm of Salzman, Ingber & Winer to return to the debtors herein all sums received by that firm over and above the $60 filing fee. Further, they are to receive no further compensation from Mr. and Mrs. Mattocks.

SO ORDERED.

### APPENDIX

#### CONTRACT FOR SERVICES

TO: MIDLAND EQUITIES, INC. 
 Two Pennsylvania Plaza 
 Suite 1230 
 New York, New York 10001

DATE: 12/29/80

PLACE: Queens County

Gentlemen:

The undersigned ("Client") hires and retains you ("MEI") to seek and obtain a solution to the mortgage foreclosure suit, case number _____, which is presently pending against client, under the following terms, conditions, and provisions:

1. **CLIENT**:

Name: Thurston & Myrtle Mattocks
Address: 175–11 110 Ave.
 Jamaica, N.Y. 11400

2. **EXCLUSIVE TERM**:

MEI appointment hereunder shall be sole, exclusive and irrevocable during the term commencing with the date hereof and continuing for a period of 180 days. Termination, by lapse of time or otherwise, shall be without prejudice to any rights, including commissions and expenses accrued to the date thereof.

3. **SERVICE OF MEI**:

Client understands and it has been knowingly and intelligently explained to Client that MEI intends to provide a solution to the aforementioned foreclosure suit and that said solution can be any of the following:

a. Obtaining of a loan commitment to pay current mortgage arrearage.

b. Obtaining of a purchaser to buy said real estate with the guaranteed option to client of repurchase of said realty. MEI is not acting as a real estate broker and will not be paid a realty commission if a sale of the property occurs, however the Client understands that a real estate commission may be due to a real estate broker.

c. Obtaining and retaining counsel to determine legal status and negotiate in behalf of client prior to foreclosure sale of said realty.

d. Obtaining competent counsel to file a Wage Earn Plan.

X _____

CLIENT UNDERSTANDS THAT ANY FEES WHETHER IT BE LEGAL FEES OR OTHERWISE WHICH IS OR MAY BE REQUIRED FOR THE FILING OF SAID WAGE EARNER PLAN IS NOT INCLUDED IN MIDLAND EQUITIES COMPENSATION HEREIN.

### NOTICE TO CLIENTS

Do not sign this agreement before you read it or if it contains any blank space. (Read all pages)

Client has read and understands all of the additional terms and conditions continued on the following pages herein and agrees that they are a part hereof as if set forth at this point.

By: Thurston Mattocks

4. **LOAN SOLUTION**:

a. Purpose: Mortgage Foreclosure solution pursuant to paragraph two above.

b. Security: Client shall secure the loan with the following collateral: All available assets.

c. Term: Lenders' prevailing term.

d. Interest Rate: Lenders' prevailing rate.

e. Repayment Terms: The loan shall be amortized by equal monthly payments of principal and interest over the term of the loan, or as otherwise required by the lender.

f. Guarantors: Client will procure the unconditional guaranty of payment of the loan by the following persons (include names and addresses):

_____

_____

_____

5. **LENDER:**

In connection with the loans referred to in this Agreement, Client:

a. Shall cooperate fully with any and all requests or requirements of any proposed lender and shall furnish and submit such documents, financial statements, income tax returns, books and records and such other data as may be requested by any potential lender and/or by MEI.

b. Shall furnish such additional security as lender may require.

c. Shall pay any and all charges of potential lender, including but not limited to legal fees, appraisal fees, feasibility studies, initial charges and other similar items related to and in connection with the application for loan and/or loan commitment.

d. Understands and acknowledges that any lender may refuse to close any loan for which a loan commitment may have been issued if there occurs any material changes in the condition, character or value of the security for the loan, or any material changes in the financial status of Client or its guarantors, or if Client has misrepresented or failed to disclose any material facts or has in any other respect failed to conform to the terms of any loan commitment or this application.

6. **BENEFIT, NON–ASSIGN-ABILITY AND ENTIRETY OF AGREEMENT:**

Upon acceptance by MEI, this instrument shall become the entire agreement of the parties on the date of such acceptance and shall be binding upon and inure to the benefit of their successors and assigns excepting that no assignment of this agreement by Client shall be valid without the prior written consent of MEI. It is understood and agreed that there are no understandings, agreements, covenants, representations or warranties, except as are incorporated herein. No amendments or modifications hereof shall be valid except if in writing and signed by all the parties.

7. **REPRESENTATIONS AND COVENANTS OF CLIENT:**

Client represents and covenants that:

a. All supporting documents, data, information, and material supplied by or on its behalf to MEI and/or lender shall be bona fide, true, and correct.

b. Any security interest supplied to obtain the loan shall be valid, free and clear of all liens and encumbrances whatsoever, except as is expressly disclosed in writing by Client to MEI and/or lender.

 c. MEI and any proposed lender are hereby authorized to make any credit check on Client and guarantors.

 d. Client shall, at its sole expense, comply with all applicable governmental regulations, laws, and ordinances relating to the loan.

 e. There are no other persons acting on behalf of Client in connection with the loan herein requested and Client agrees to hold MEI harmless from any and all claims of others in connection with this application.

 f. There is no pending or threatened litigation existing against Client other than that disclosed in writing.

8. **REPRESENTATIONS AND COVENANTS OF MEI:** Client acknowledges that no representations or warranties have been made to it by MEI other than that MEI will exert its best efforts to obtain the solution requested, and more in particular, but without limitation upon the generality of the foregoing, Client acknowledges that MEI has not represented or warranted that it will procure any loan in any amount or upon any particular terms for Client. Client further understands and acknowledges that if any loan agreement is entered into between it and any lender, that the performance of any such agreement by the lender is not guaranteed by MEI in any respect whatsoever, that the enforcement of any obligations in any such agreement with lender shall be the sole and exclusive responsibility of Client.

9. **DEFAULT:** If Client shall fail in the performance or observance of any of the terms and provisions hereunder and/or have misrepresented or failed to disclose any material fact, then in such event, MEI at its option and without prejudice to any other remedy, may, without notice or demand of any kind, terminate this agreement and retain as liquidated damages any and all monies deposited hereunder for any purpose whatsoever by Client.

10. **NOTICES:** All notices, request or other communications hereunder shall be in writing and deemed duly given if delivered to a party personally or mailed by registered or certified mail to a party at its address as appears in this instrument, or at such other address as either party may hereafter notify the other party in writing.

11. **GOVERNING LAW:** This agreement shall be construed and enforced in accordance with the laws of the State of New York.

12. **COMPENSATION:** In consideration of the services of MEI in obtaining a loan commitment or solution pursuant to paragraph two (2) herein, Client shall pay to MEI a REFUNDABLE fee in the sum of one thousand dollars ($1,000.00). The fee of MEI shall be deemed to have been earned and due with the establishment of a solution per paragraph two (2) herein or upon the issuance of a loan commitment by a lender procured by MEI which is either (a) accepted by Client, or (b) (whether or not accepted) which conforms substantially to the terms,

**390**

 conditions, and provisions of the loan as set forth herein.

Very truly yours,

_____

By: Thurston Mattocks
Title: _____
 (Client)
Guarantee
We agree to act as the guarantors, jointly and severally for payment of any loan obtained under the foregoing instrument and the form of the guaranty shall be as required by the lender, and guarantors agree to provide all information requested by the lender.

_____

_____

_____

ACCEPTED THIS 29 DAY OF December, 1980.

MIDLAND EQUITIES, INC.
By: S. Dorf
Title: Vice-President

METHOD OF CONNECTION: MA

NOTICE REGARDING LEGAL FEES

CLIENT UNDERSTANDS THAT THERE WILL BE AN <u>ADDITIONAL</u> LEGAL FEE REQUIRED FOR THE FILING OF A WAGE EARNER PLAN.

SAID LEGAL FEE IS IN ADDITION TO THE FEE CHARGED BY MIDLAND EQUITIES OF NEW YORK, INC.

I HEREBY ACKNOWLEDGE THAT THE ABOVE NOTICE REGARDING LEGAL FEES WAS EXPLAINED TO ME IN DETAIL.

Thurston Mattocks
Date: 12/29/80

\* EXTRA PAYMENTS