**In re John Allen VANN, Debtor.**

**Bankruptcy No. 88 B 11859 J.**

United States Bankruptcy Court,
D. Colorado.

June 4, 1991.

H. Thomas Coghill, Coghill & Goodspeed, P.C., Denver, Colo., for The Law Offices of Andrew L. Quiat, P.C.

Paul G. Quinn, Denver, Colo., for Trustee, Andrea S. Berger.

Marcia S. Krieger, Littleton, Colo., for creditor Christopher L. Phillips.

Peter J. Lucas, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for creditor Metro Nat. Bank.

Kris E. Jukola, Hall & Evans, Denver, Colo., for creditor Resolution Trust Corp., as Receiver of Capitol Federal Sav. and Loan Ass'n.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Disclosure and Statement of Compensation filed May 23, 1991, by The Law Offices of Andrew L. Quiat, P.C. ("Quiat") in response to this Court's Order entered April 23, 1990, in Adversary Case No. 89 J 0451. On June 13, 1990, this Court ordered that any party having any objections to the fees claimed by Quiat had to and including July 2, 1990, to file their objections. Timely objections were filed by creditors C.L. Phillips, the Resolution Trust Corporation as Receiver of Capitol Federal Savings and Loan Association, Metro National Bank, and by the Chapter 7 Trustee. Hearing on the matter commenced on October 23, 1990, continued on December 14, 1990, March 6, 1991, and April 12, 1991.

## ETHICAL CONSIDERATIONS

■ The Court, and all parties agree, that this entire matter is to be considered under 11 U.S.C. § 329, not § 327. Somehow Quiat argues that the standards should be different under the two sections, i.e. that under § 329 all the court should consider is whether the compensation "exceeds the reasonable value of any such services." Quiat is relying on the case of *In re Devers*, 12 B.R. 140 (D.D.C.1981). That case held that ethical violations are relevant to fee determinations in bankruptcy proceedings, but that it is the absence of competency, not the violation of the Code of Professional Responsibility, that affects the fee determination, and that there must be specific findings that the unethical conduct lessened the value of the lawyer's services to his clients in order to support reductions in the fees. Thus, argues Quiat, the *per se* rule contained in 11 U.S.C. § 328(c) regarding denial of all fees in the event of conflicts of interest by the attorney, does not apply. This Court agrees that § 328(c) does not apply in a matter under § 329, if for no other reason than § 328(c) is limited by its own terms to matters arising under §§ 327 and 1103. However, the fact that § 329 does not list ethical improprieties as a criterion in determining the reasonableness of fees does not preclude this court from looking to the legislative history of § 329 and resorting to well established tenets of common law and strong public policy considerations. *In re Paine*, 14 B.R. 272 (W.D.Mich.S.D.1981).

■ Judge Kane in *In re Land*, 116 B.R. 798 at 804 (D.Colo.1990) quoted from the legislative history as to the purpose and intent of § 329, to-wit:

"Section 329 was enacted in response to the concern that [p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny." H.R.Rep. 595, 95th Cong., 1st Sess. 329 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 39, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5825, 6285.

Judge Gibson, U.S. District Court Judge, in the *Paine* case, *supra,* traced the common law back to the Seventeenth Century and found that an attorney must not repre-

sent opposing interests and that the penalty for doing so is the denial of any fees. ... the Courts will not allow the attorney to demonstrate that the conflict of loyalties had no influence upon his conduct, nor that in fact his labors were successful. Put succinctly, "when an actual conflict of interest exists, no more need be shown ... to support a denial of compensation." *Woods v. City Nat. Bank & Trust,* 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). 14 B.R. 272, 274.

Judge Gibson also found that there is a strong public policy in maintaining the public confidence in the integrity of the judicial process, particularly regarding bankruptcy proceedings. Judge Gibson further stated: "At common law such conduct would clearly preclude the attorney from enforcing a claim for compensation, here the bankruptcy court must exact no less." 14 B.R. 272, 275.

Thus, at least insofar as where a conflict of interest is shown when an attorney's fees are questioned under § 329, this court adopts a *per se* rule that a debtor's attorney must forfeit all fees. *See also, In re Mattocks,* 15 B.R. 379 (Bankr.E.D.N.Y. 1981).

■ Quiat had a long standing relationship with the Debtor, both as an attorney and as a business partner. In 1973 a limited partnership was formed called Midcontinent Management Group. Both Quiat and the Debtor were and are general and limited partners. In fact Quiat was the attorney and manager of the partnership. Another partner was Stapo Company in which the Debtor held a general partnership interest. The evidence showed that the Debtor had attempted (through Quiat)[1] to transfer his partnership interests in Midcontinent and Stapo to his children prior to bankruptcy but that Quiat had failed to properly complete the transfer. Thus, at the time of the Debtor's petition, the Debt-

or still remained a general and limited partner, as did Quiat. A contract to sell real property of the partnership for $88,000 was initiated in June 1988, (just prior to the bankruptcy) between the partnership (with the Debtor signing on behalf of the partnership as general partner) and Cooley Gravel Co. As late as January 30, 1989, the parties were still exchanging amendments to the sales contract. The contract was eventually abandoned, but all of this activity was completely secreted from the Trustee and creditors. The Debtor was in fact a general and limited partner, as was Quiat, all during this bankruptcy. And in fact Quiat was representing both the Debtor and the partnership, and presumably himself as a partner. Therefore, an actual conflict existed and continues to exist. *In re W.F. Development Corp.,* 905 F.2d 883 (5th Cir.1990). Quiat himself, as a partner in the partnership, was an interested party in this bankruptcy proceeding and therefore could not have represented the Debtor herein without conflict.

In addition, a Mr. Fairchild who is a creditor in this bankruptcy, was also a limited partner in the partnership. Thus, Quiat held a fiduciary relationship to Mr. Fairchild through the partnership (which Quiat admits in his Hearing memorandum filed October 12, 1990), and yet Mr. Fairchild, as a creditor herein, held interests adverse to the Debtor whom Quiat represented. If not an actual conflict of interest, there is a definite potential conflict.

Quiat also represented the Debtor, the Debtor's wife, Jill, and the Debtor's children in these bankruptcy proceedings. Jill is not a debtor in bankruptcy. The Debtor filed his Chapter 7 petition on September 2, 1988. The day previous the Debtor filed a petition in state court for legal separation from Jill. When a spouse files an action for dissolution of marriage, the inchoate rights of the spouse in the marital property

---

**1.** Quiat admits on page 9 of his Hearing Memorandum that it was his position that the attempted transfer was ineffective and that upon filing of the [bankruptcy] petition herein the Trustee succeeded to Mr. Vann's general partnership interest in Stapo. Yet he never revealed this to

the Trustee, nor did he reveal that the main asset of Midcontinent and Stapo was being sold for $88,000, at least until he was pressed to do so. This is hardly an ethical pattern of conduct for an officer of the court.

become choate. *In re Harms,* 7 B.R. 398 (Bankr.Colo.1980); *In re Fisher,* 67 B.R. 666 (Bankr.Colo.1986). The fact that here a petition for legal separation rather than for dissolution was filed is of no consequence. The requirements for either are the same. For example, § 14–10–107, C.R.S., provides that in either case the petition must allege that the marriage is irretrievably broken and that certain other matters must be pled, e.g. any arrangements as to the custody and support of the children and the maintenance of a spouse. And § 14–10–113 specifies that the court shall divide the marital property. Although the filing of the state court action did not give Jill any vested rights in specific property of the Debtor, it did give her the "right to be compensated from the husband's [bankruptcy] estate for the value of her share of the marital property." *In re Fisher, supra* at 669. Thus, Jill Vann, the Debtor's spouse was a party in interest in this bankruptcy with interests adverse to the Debtor.

Quiat claims that his representation of Jill at the exemption hearing created no conflict because the goals of both Jill and the Debtor were identical, i.e. preservation of the claimed exemption. But that is a red herring. The conflict arose because, as stated in Quiat's Disclosure and Statement of Compensation filed May 23, 1990:

> Following the filing of the bankruptcy case, Quiat reviewed the separation proceedings, consulted with Mrs. Vann and advised Mrs. Vann concerning the impact of the bankruptcy case on the separation proceedings and the separation agreement.

The time entries following that language indicate that Quiat performed these services on May 10, 1989, June 7, 1989, and January 31, 1990.

Then, later in the same document, under services rendered to the *Debtor* in connection with the bankruptcy on pages 6 and 7, Quiat shows that these services (participation in "global" settlement discussions with the Trustee and creditors) were rendered on April 6, 1989 and June 7, 1989— all at a time when he was advising Jill on the impact of the bankruptcy case on the separation proceedings. In fact, he was working for both parties on the same day, i.e. June 7, 1989. A "global" settlement with the Trustee and creditors would necessarily have meant that Jill's choate, but unvested, interests in the marital property would or could be affected and that her interests were not necessarily the same as the Debtor's. The Debtor may very well have been willing to concede more property to the Trustee and creditors in order to avoid a § 523 or § 727 complaint. That would have meant less exempt property upon which Jill could assert her marital property rights directly without having to fight the Trustee and other creditors.

The evidence also showed that although Quiat did not formally enter any bankruptcy proceedings as counsel of record he was representing Jill as early as February, 1989.[2] At that time he called Debtor's current counsel, Nancy Miller. In March, 1989, he met with Miller on behalf of Jill. Then, also in March, 1989, prior to his entry of appearance for Jill at the exemption hearing on June 15, 1989, he forced his way into a discussion being held in the coffee shop at the court facilities between Miller, the Trustee's counsel (Paul Quinn), and Richard Silverstein (who was also representing the Debtor at that time) proclaiming he was representing the *Debtor.*[3] The antagonism between Quinn and Quiat began at that time because of Quiat's "pushy" and "hostile" attitude toward

---

**2.** Quiat's Disclosure and Statement of Compensation reveals that on May 10, 1989, he received $1,175.25 from the Debtor for work performed in April, 1989. But the Statement does not reveal any time entries for that April work so we don't know if it was on behalf of the Debtor or Mrs. Vann.

**3.** As near as the Court can determine from its own files, the first formal entry of appearance

by Quiat in any of these proceedings was on June 5, 1989, in Adversary No. 89 J 451 when he filed a Motion to Dismiss on behalf of the Debtor. That adversary concerned Debtor's alleged transfers of property to his wife pre-petition, and his failure to disclose information about his deferred compensation plan and his interests in Mid Continent.

Quinn. The other attorneys did not want Quiat included in their conversation and Quiat was "belligerent" and "agitated."

Thus, the evidence and the Court's own records, reveal the following representations of Quiat in these proceedings:

1. Quiat told Miller in February, 1989, he represented the Debtor's wife, Jill.

2. Quiat told Miller, Quinn and Silverstein in March, 1989, he represented the Debtor.

3. June 5, 1989, he files Motion to dismiss Adversary No. 89 J 451 on behalf of the Debtor. Case concerned Debtor's prepetition transfers to Jill, Debtor's deferred compensation accounts, and Debtor's interests in Midcontinent and a denial of Debtor's discharge under § 727.

4. June 15, 1989, Quiat appears in open court and enters appearance for Debtor's wife, Jill, in hearing on objections to Debtor's Claimed exemptions in main bankruptcy Case No. 88 B 11859 J.

5. July 19, 1989, Quiat enters Adversary Case No. 89 J 0122 as co-counsel for Debtor. Case concerned Debtor's pre-petition transfers to Debtor's wife, Jill, his deferred compensation accounts and a denial of Debtor's discharge under § 727.

6. July 24, 1989, Quiat enters Adversary Case No. 89 C 0120 as counsel for the Debtor. Case involved Debtor's failure to reveal interests in Midcontinent, his deferred compensation accounts, and a denial of Debtor's discharge under § 727.

7. June 16, 1989, an Application to Employ Quiat on behalf of the Debtor for Adversary Nos. 89 C 0120 and 89 J 0122 is filed. That Application revealed that the Debtor had pledged post-confirmation contributions in his deferred compensation accounts to Quiat and had given Quiat a security interest in the Debtor's interests in Executive Hangars Number 1, a limited partnership. In connection therewith, Quiat files a Statement saying:

The Law Offices of Andrew L. Quiat have no connection with the debtor, creditors or any other party in interest, except as follows: Andrew L. Quiat has represented in the past, and currently represents debtor's wife Jill Vann. John Allen Vann and Jill Vann have been advised of the conflicts of interest and have consented to the representation. Andrew L. Quiat is a general and limited partner of Midcontinent Management Group, a Colorado limited partnership, and the nature of John A. Vann's interest, if any, has been raised in some of the adversary action.

That statement does not reveal the relationship with Mr. Fairchild, a listed creditor in the bankruptcy, *supra,* nor Quiat's role as manager and attorney for Midcontinent and as managing general partner of Stapo. Nor did it reveal that Quiat had been advising Jill of the impact of the bankruptcy on the legal separation agreement.

8. As early as June 26, 1989, Quiat was billing for work in Adversary No. 89 J 497 wherein he represented the Debtor's wife against the Trustee's complaint for turnover.

9. July 19, 1989, Quiat files a Request for Special Notice on the main case on behalf of Jill.

10. July 26, 1989, Quiat withdraws the previous Application to Employ and a "Disclosure of Compensation" purportedly in compliance with Bankruptcy Rule 2016(b). He makes the same disclosures and nondisclosures as previously indicated, and he fails to reveal the $1,175.025 received by him on May 10, 1989, and the $2,599.10 received on June 7, 1989.

11. December 5, 1989, Quiat files a Special Entry of Appearance on behalf of the Debtor in the main case "for the sole and limited purpose of representing the Debtor with regard to the prosecution of his Objection to claim No. 20 of Christopher L. Phillips" and files said objection the same date.

12. December 6, 1989, Quiat files an Objection to a Stipulation for Settlement of Claim Against Capitol Federal Savings & Loan on behalf of Jill.

13. December 22, 1989, Quiat files a Supplemental Special Entry of Appearance on behalf of the Debtor for the prosecution of the objection to Claim # 20; to respond to and defend against the Trustee's Motion

for Restraining Order Against the Debtor; and Trustee's Motion requesting the Court direct the Debtor to turn over certain telephone records.

14. January 12, 1990, Quiat files a Motion for Reconsideration of Order Directing the examination of the Debtor under Bankruptcy Rule 2004 and signs the pleading as "Co-counsel" for the Debtor. The Court, no matter how Quiat characterized his earlier and later appearances, considers this a general entry of appearance in the main case as counsel for the Debtor. There were no limitations of any kind put on this appearance and the matter did not concern any of the previously indicated specific matters, but was, rather, concerning a general Rule 2004 exam of the Debtor.

15. February 7, 1990, Peggy E. Stevens, Esq. enters her appearance in the main case for Stapo and alleges, *inter alia*, that the Debtor's purported transfers of the Stapo interests to the Debtor's children was ineffective and that, therefore, the Trustee succeeded to the Debtor's interests upon the filing of the bankruptcy. Stevens is first revealed in the Application to Employ filed June 16, 1989 as an "independent contract attorney" with whom Quiat has a fee sharing agreement for work done on behalf of the Debtor. Thus, Stevens now represents an entity in which the Debtor is a general partner, and the Debtor (because of her relationship with Quiat).

16. February 28, 1990, Nancy Miller files a Motion to Withdraw as Attorney for Debtor and states that "Mr. Quiat has been actively and exclusively representing the Debtor for a number of months in this [main] case and in the consolidated adversary proceeding and is in constant contact with the Debtor."

17. March 5, 1990, Quiat enters his appearance for Jill, the Debtor's children and the children's Trust in an adversary proceeding Case No. 89 C 1412 brought by the Trustee under §§ 542, 548, and 550. Quiat testified under oath at the hearing herein that he did *not* represent Jill and the children in this adversary case. This was a deliberate lie and misrepresentation because the Court files reveal that he filed an Acceptance of Service for them on March 5, 1990, and a Response to Motion for Default on March 7, 1990. Then on March 22, 1990, Ms. Stevens appears again, as "co-counsel" for Jill, the children, and the Trust, although she admitted that she never met Jill or the children and that she had only talked to Jill on the telephone. As Mr. Quinn once stated, Quiat was like a phantom, entering and leaving the cases at will. Quiat's and Stevens' appearances in this case for the wife, children and the children's Trust created yet another conflict for them. It was Debtor's position all along that his purported transfers of his interests in Midcontinent and Stapo were transferred to his children and the children's Trust. The Trustee disputed the validity of those transfers and sought the return of that property to the estate in this adversary. Of course it would be in the interest of the children and their Trust to have the court uphold those transfers. It would be in the interest of Debtor's wife *not* to uphold these transfers because then the property would be in the Debtor's estate and would be subject to her claims of marital property. So we have Quiat, who represents the Debtor, the Debtor's wife, the Debtor's children, and the children's Trust, Midcontinent and Stapo (with fiduciary obligations to Midcontinent, Stapo, and the other limited and general partners, including Mr. Fairchild, a creditor herein), admitting that in his personal opinion the transfers were not effective, yet taking the position on behalf of at least some of his clients that they were effective. And we have Stevens, who represents the Debtor (through contract employment with Quiat), who also represents Stapo (and asserts on behalf of that client that the transfers were ineffective), and who now also represents the wife and children opposing the Trustee's assertion that the transfers were ineffective when the wife and children have diametrically opposing interests. Truth is stranger than fiction.

■ It is Quiat's position that these conflicts were disclosed to Jill and the Debtor and that they waived any such conflicts. (See Exhibits 49 and 50). However, these

documents are totally insufficient. They do not detail the potentials for conflicts; they do not disclose that the attorney client privilege is waived; and they do not specify that if a conflict arises, Quiat must withdraw from representation for both. Instead, Exhibit 49 states that Quiat can, upon notification, choose that party he wishes to represent. And, obviously, they do not contain an independent waiver on behalf of the children or the children's Trust, but rather Jill, as guardian of the children, executed the waiver—the same person who has adverse interests to the children. This Court agrees with the testimony of Ms. Helen Stone that all of these multiple representations by Quiat and Stevens were ethically improper and that no proper disclosure of the conflicts and potential conflicts was made. Therefore, there could be no effective waiver by the Debtor and his wife. In addition, no disclosures or waivers were ever presented in connection with Midcontinent, Stapo, Mr. Fairchild, or any of the other general or limited partners of these entities.

The Court gives little or no weight to the testimony of Alex Keller when he opined that Quiat had acted ethically simply because Mr. Keller admitted that he had not reviewed many of the relevant documents herein. Therefore, the Court finds that Mr. Keller was not sufficiently informed as to the underlying facts to enable him to give a credible opinion.

To demonstrate how Quiat conducted himself throughout this proceeding, one incident should be noted, although it has nothing to do with the conflicts of interest discussed above, but it does show the general cavalier attitude of Quiat relative to ethical matters.

A deposition of Quiat, as a principal of Midcontinent, was taken on Friday, February 22, 1990, by the Trustee. He was represented at the deposition by none other than Stevens. Due to numerous objections by Stevens to questions put to Quiat, the deposition took much longer than anticipated. Therefore, the scheduled deposition of the Debtor set for 4:00 p.m. was not started on time. The parties agreed that since they all had other matters scheduled for the next Monday, that the Debtor's deposition would be continued to that date. On the following Monday, after a lunch break, Quiat asked that the deposition of the Debtor be interrupted and that the parties enter into settlement negotiations. The Trustee's attorney agreed and the parties took a break. At that time the Trustee's attorney was served with a Motion for Sanctions for failure to take the Debtor's deposition as scheduled the previous Friday. When confronted with that Motion, Quiat stated that he would withdraw the document if Trustee's attorney agreed to settle the case. Stevens admitted she prepared the Motion and Quiat signed it.

## CONFLICTS vs. VALUE OF SERVICES

Even if this Court were to adopt the standard of the *Devers* case, *supra,* the Court finds that Quiat would be entitled to no fees. Quiat reports in his May 23, 1990 Disclosure and Statement of Compensation that he has charged fees of $161,348.00 and costs of $16,846.35 (totalling $178,194.35) and that he has received $124,103.14 for the period of April 6, 1989 to April 30, 1990.

Before Quiat began his all out representation of the Debtor, Debtor's previous counsel, Miller, had obtained the Debtor's signature to a proposed "Global Settlement Agreement" in June 1989. See Exhibit NNN. In that proposal the Debtor basically agreed to:

1. Pay 40% of his net cash flow to a Settlement Fund;

2. Pay 5% of the allowed administrative claims, or about $33,000;

3. Pay 100% of all allowed unsecured claims with interest at 8%;

4. Waive his claimed exemption to the deferred compensation accounts;

5. Sell a property at 5822 S. Sheridan Blvd., Littleton, Colorado, and contribute the net proceeds to the Settlement fund and waive any claim of homestead exemption to that property;

6. Convey the net proceeds of the sale of an airplane hangar to the Settlement Fund;

7. Pay 100% of the net of any Productivity Bonuses he may receive to the Settlement fund;

8. To maintain a decreasing term life insurance policy on his life in favor of the Trustee in the amount of the allowed claims; and

9. Entry of a denial of discharge under § 727(a)(5) if he defaulted in the terms of the agreement.

In return the Trustee would have to agree to waive any claims to any personal property of the Debtor or his family and upon payment in full by the Debtor to dismiss the Chapter 7 case and all other litigation, including any claims against the Debtor's wife.

The Trustee, and the other creditors, never did formally accept that proposal. However, the testimony showed that they had agreed to its basic terms. The only difficulty the Trustee had was the possible tax consequences to the bankruptcy estate. The Trustee and the creditors wanted to do some investigation on that issue before agreeing to the proposal. Even Debtor's then counsel Miller testified that the settlement was "almost all done" and there was a meeting of the minds on most issues except the tax ramifications to the estate. Then, in August, 1989, after Quiat entered the picture in earnest, the Debtor withdrew the authority to settle from Miller and withdrew his proposal. This, the Court finds, was most probably due to the urging of Quiat who was heard to say that he would "bring the Trustee to her knees."

What ensued was one of the most acrimonious, time consuming, and time wasting fiascos this Court has ever seen. The Court ended up having to have all discovery supervised. The parties couldn't even agree on what year it was. Everything was challenged. There was a total absence of good manners, let alone professional courtesy. The litigation referred to, *supra*, went forward with a vengeance.

Even though Quiat knew that the Trustee was seriously challenging the Debtor's purported transfers of his interests in Mid-continent and Stapo; that he was a general and limited partner and managing partner in these entities; that it was he who had failed to properly complete these transfers; and that he would most likely be called as a witness, he continued in his representation of the Debtor up to the last moment. Finally, in March, 1990, he called in new counsel, Mr. Glen Keller. Largely through the efforts of Mr. Keller, there was a "global" settlement reached. What was the cost to the Debtor? Mr. Keller's fees were over $200,000.00. The Trustee incurred additional attorney's fees of approximately $100,000.00.

What did the Debtor get for all this? The settlement agreement finally approved by the Court provided that the Debtor would:

1. Contribute 50% of his net cash flow over $22,000.00 per month to a Settlement Fund or a minimum of $2,000.00 per month until Keller and Quiat have been paid in full and thereafter 100% of his net cash flow over $22,000.00 per month;

2. Execute a wage assignment for such payments to the Trustee (something the Trustee could not have obtained by court order);

3. Pay *all* allowed administrative (including the additional attorneys fees for the Trustee) and unsecured claims and would pay 8% interest to the unsecured claimants;

4. Would pay at least $800,000.00 to the Settlement Fund by June 5, 1995, with total payment by June 5, 1997;

5. Maintain a life insurance policy on himself with the Trustee being entitled to the first $1,000,000.00; and

6. Agree to a judgment of non-discharge in the event of a default by him under the agreement.

The Trustee agrees that after the first $250,000.00 is paid by the Debtor, she will dismiss any proceedings against the Debtor's wife and children and that all proceedings against the Debtor would be dismissed upon payment in full by the Debtor.

Even Mr. Sterling, who was called as a witness by Quiat at the hearing herein, admitted that the final agreement resulted

in at least a net loss of $162,000.00 to the Debtor. But even this estimate overlooks the additional fees of Mr. Keller for over $200,000.00. But the most accurate description of the final outcome was given by Mr. Clarke when he said that this final settlement was the most unfavorable settlement for a debtor he had ever seen—and he has been engaged in the exclusive practice of bankruptcy law since 1979. Mr. Clarke opined, and this Court agrees, that the settlement shows the Debtor had no defense and that the case should have been settled in the Summer of 1989. Everything occurring after that was totally unnecessary. As Mr. Clarke put it, the Debtor "took a beating." Thus, this court concludes that the Debtor received absolutely no benefit from the "services" of Quiat, conflicts and ethical considerations aside.

## NONCOMPLIANCE WITH RULES

Bankruptcy Rule 2016(b) provides, *inter alia*, that a debtor's attorney shall file a supplemental statement "within 15 days after any payment or agreement not previously disclosed." As stated previously, Quiat failed to disclose two payments, but it is much worse than that. Below is a listing of payments received by Quiat and not reported as required by the Rule until this Court ordered him to file a statement (which he did on May 23, 1990):

| | |
|---|---|
| 5/10/89 | $ 1,175.25 |
| 6/7/89 | 2,599.10 |
| 8/5/89 | 16,000.00 |
| 10/31/89 | 3,500.00 |
| 11/30/89 | 14,680.00 |
| 12/31/89 | 25,000.00 |
| 1/31/90 | 17,066.46 |
| 2/28/90 | 5,000.00 |
| 3/31/90 | 39,082.33 |
| Total | $124,103.14 |

In addition, the payments received on 11/30/89 and on 3/31/90, came from prepetition assets of the Debtor that Quiat *knew full well* were the subject of litigation in this very court at the time he received them. In fact, the $39,082.00 was from the Debtor's deferred compensation accounts which this court ruled were not exempt. That ruling was appealed, but is final now. Quiat admits in his Disclosure Statement that he received these funds after the matter had been litigated but no ruling had been received from the court. Again, hardly proper conduct as an officer of the court, especially when the receipt was not disclosed until after this Court ordered disclosure.

## ADEQUACY OF DISCLOSURE STATEMENT

The Disclosure Statement filed by Quiat on May 23, 1990, and all of the exhibits tendered at the hearing herein, even taken as a whole, are totally insufficient for this Court to make a determination as to the reasonableness of the fees and costs. Even if, as Quiat would wish, this Court looked at his Disclosure Statement with blinders on, it is insufficient as a matter of law. There is no detail given from which this Court can make a reasoned judgment under the standards of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), *In the Matter of Permian Anchor Services, Inc.*, 649 F.2d 763 (10th Cir.1981), and *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983). It is, therefore,

ORDERED that The Law Offices of Andrew L. Quiat, P.C., and Andrew L. Quiat, Esq., are entitled to no fees for services rendered in this and related cases. It is

FURTHER ORDERED that The Law Offices of Andrew L. Quiat, P.C., and Andrew L. Quiat, Esq., shall, within ten (10) days from the date of this Order refund and pay over to the Trustee herein all sums received from or on behalf of the Debtor since September 2, 1988. Said sums shall be for the benefit of the Debtor and shall be credited by the Trustee to those payments required under that certain Settlement Agreement dated April 27, 1990, HOWEVER, said credit shall be given for *last* payments due from the Debtor under that agreement and shall in no way modify the Debtor's current obligations under that Agreement. It is

FURTHER ORDERED that any lien or security interest held by The Law Offices of Andrew L. Quiat, P.C., or Andrew L. Quiat, Esq., in property of the Debtor, in-

cluding future wages and earnings, bonuses or deferred compensation, is declared to be null and void.