In the Matter of Andrew L. QUIAT,
Attorney–Respondent.

Nos. 97SA121, 97SA461.

Supreme Court of Colorado,
En Banc.

April 26, 1999.

Linda Donnelly, Attorney Regulation Counsel, Kenneth B. Pennywell, Assistant Regulation Counsel, Denver, Colorado, for Complainant.

George S. Meyer, Denver, Colorado, for Attorney–Respondent.

PER CURIAM.

The respondent in these two consolidated lawyer discipline cases, Andrew L. Quiat, was admitted to practice law in Colorado in 1972. A hearing board heard No. 97SA121, the bankruptcy matter, on May 8, 9, and 20, and June 6, 7, 25, and 26, 1996. At the conclusion of the hearing, the board found that Quiat had committed professional misconduct and recommended that he be suspended from the practice of law for six months. A hearing panel of the supreme court grievance committee approved the findings, but modified the recommendation to require Quiat to peti-

tion for reinstatement. Because we set aside several of the board's legal and factual determinations in the bankruptcy matter, we conclude that a three-month suspension without the requirement of reinstatement proceedings is appropriate.

In No. 97SA461, the collection matter, the hearing panel approved the findings and recommendation of a different hearing board that Quiat be privately censured for dishonest conduct. We dismiss this proceeding because the complaint did not adequately place Quiat on notice that he must defend against a charge of dishonest conduct, contrary to the requirements of C.R.C.P. 241.12(a)(2).

## I. No. 97SA121

### The Bankruptcy Matter

Despite the length of the hearing and size of the record, the relevant facts underlying No. 97SA121 are largely undisputed. In 1973, Quiat, John A. Vann, and another individual formed a general partnership called STAPO. STAPO was the general partner of a limited partnership, Mid–Continent Management Group (MMG). MMG owns ninety acres of undeveloped land in Douglas County. Quiat and Vann were among MMG's limited partners.

Vann tried to convey his interests in MMG and STAPO to his two children in 1987. The transfer of his partnership interest in STAPO was not effective because the partnership agreement required that he first offer his interest to the other partners, which he did not do. Vann asked Quiat to file an amended limited partnership document to reflect the transfer of his interests in MMG. Although Quiat agreed to do this, he never filed it.

On September 2, 1988, Vann filed a Chapter 7 bankruptcy petition, seeking to discharge nearly $4 million in debt. He was initially represented by a lawyer other than Quiat. The day before he filed for bankruptcy, Vann filed for legal separation from his wife, C. Jill Vann. In the legal separation proceeding, Vann and his wife were represented by separate lawyers. Jill Vann was listed as an unsecured creditor on her husband's bankruptcy schedules, and her claim

was designated "disputed." Although the Vanns reconciled on November 1, 1989, the legal separation proceeding was pending throughout the time relevant to this case.

Assuming that Vann's attempted transfers of his partnership interests in STAPO and MMG were ineffective, Vann remained a general partner in STAPO and a limited partner in MMG at the time the bankruptcy was filed. Quiat also was a general partner and a limited partner of these entities. Further, Quiat represented the partnership.

In February or March 1989, Vann asked Quiat to represent him, his wife, and his two children in the bankruptcy. Quiat's two conflicts advisements and waivers to John and Jill Vann did not identify his relationship to STAPO and MMG. Quiat began working in the Vann bankruptcy in April 1989.

Quiat appeared on behalf of Vann in at least three adversary actions that were filed challenging the dischargeability of certain of Vann's debts. One of the proceedings challenged the validity of Vann's attempt to transfer his interests in STAPO and MMG to his children. Quiat was listed as a witness regarding the validity of these transfers. Count I of the complaint in this discipline case charged that Quiat violated DR 5–101(A), which prohibits a lawyer from accepting employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests—unless the client consents after full disclosure.[1] It also charged Quiat with violating DR 5–101(B) (providing that a lawyer shall not accept employment in contemplated or pending litigation if it is obvious that he ought to be called as a witness).

The hearing board found that Quiat violated DR 5–101(A) when he undertook to represent Vann in the bankruptcy because he had a business relationship with Vann both as a limited partner in MMG and as a general partner in STAPO. Since Quiat's advisement and waiver of conflict letter to Vann did not mention these business relationships, the board concluded that the disclosure was in-

complete, rendering Vann's conflict waiver ineffective. The board also found that Quiat violated DR 5–101(B) because at the time he accepted employment by Vann, he was aware from the bankruptcy schedules that MMG and STAPO were listed as assets. Quiat knew that Vann had asked him to transfer Vann's partnership and limited partnership interests to his children and that he had not done so. In the board's view, Quiat had reason to believe that he would be called to testify concerning who owned the interests in MMG and STAPO, and that a conflict would exist between Vann and him, especially since Quiat had failed to complete the transfers of the partnership interests before the bankruptcy was filed. The trustee's lawyer advised Quiat in December 1989 that he would be called as a witness, which the board said was "an event Quiat should have anticipated without the least uncertainty."

One of Vann's creditors was Paul Fairchild, a limited partner in MMG. Fairchild was listed as an unsecured creditor for a contingent and disputed amount in a matter unrelated to MMG, and he never actually filed a claim in Vann's bankruptcy. Quiat admitted that as a general partner in STAPO and a limited partner in MMG he stood in a fiduciary relationship to Fairchild. *See Elk River Assocs. v. Huskin*, 691 P.2d 1148, 1152 (Colo.App.1984). Nevertheless, the board found that Quiat undertook to represent Vann in his bankruptcy even though the interests of the other general and limited partners, including his own and Fairchild's, were actually or potentially adverse to Vann's.

 Usually a general partner's liability is joint and several with the other general partners for all debts of the general partnership and any limited partnership of which the general partnership is a general partner. *See Black v. First Federal Savings & Loan Ass'n*, 830 P.2d 1103, 1111 (Colo.App.1992), *aff'd sub nom., La Plata Med. Ctr. Assocs. v. United Bank of Durango*, 857 P.2d 410 (Colo. 1993). A limited partner's liability is normally limited to the extent of the limited partner's contribution. *See id.* The hearing

---

1. Because the relevant events in this case occurred before the effective date of the Rules of Professional Conduct, January 1, 1993, the Code of Professional Responsibility applies.

board found that MMG's limited partnership agreement created additional liability for the limited partners in that the limited partners were to contribute to the maintenance of the property and the payment of taxes. The board continued:

> The general partners have a fiduciary relationship with the limited partners. As Vann's counsel, however, the respondent would be attempting to discharge Vann's debts, including his obligations to MMG, thereby increasing the financial exposure of the other limited partners. Doing so would compromise the fiduciary relationship the respondent had with the other partners, even in cases such as this where the assets and liabilities of MMG and STAPO were not substantial.

The board concluded that by representing Vann in the bankruptcy, "the respondent placed himself in the position of breaching his fiduciary relationship to his other partners in MMG and STAPO." The board therefore found that Quiat engaged in conduct that adversely reflected on his fitness to practice law, in violation of DR 1–102(A)(6).

Quiat began work on Vann's bankruptcy in April 1989. On April 19, 1989, Quiat entered into an agreement with Jill Vann to represent her interests in her husband's bankruptcy, with her husband guaranteeing the payment of her legal fees to Quiat. Quiat in fact billed John Vann for the services he rendered to both John and Jill Vann.

On May 31, 1989, when he entered into a retention agreement with John Vann to represent him in at least three of the adversary proceedings, Quiat included a conflict disclosure addressed to both John and Jill Vann. The letter indicated that Quiat had been retained by Jill Vann to protect her interests in approximately $15,000 worth of personal property and to explore with Jill the advisability of filing a claim as an unsecured creditor in John's bankruptcy. The letter stated that John had asked Quiat to represent him in three section 727 adversary proceedings.[2] "If any one of these actions are successful against John, it would totally bar John from discharging any debt to any of his creditors.

Jill would be a creditor once she files her claim." On the other hand, if Quiat were successful in defending against the section 727 proceedings, "this would create or further an interest to Jill in the bankrupt estate." Therefore, "[a]ny of the actions I [Quiat] undertake for John may be in detriment to Jill's interest in the bankruptcy as a large potential unsecured creditor." Quiat's letter also stated, "I have indicated to each of you that there is a clear and blatant conflict of interests between my aggressively and zealously representing Jill and doing the same for John." Nevertheless,

> you have both indicated to me that you desire that I represent each of you with the clear understanding that the overall goal is to bring John through the bankruptcy with as many assets as possible and with the minimum payout in settlement and hopefully avoid any adverse finding under any Section 727 suit. It has been clearly stated to me that Jill's interests in the assets and in any claim she may make as a potential unsecured creditor is secondary. My understanding is that you each view Jill's present interest as secondary in this regard because of the fact that to the extent I protect John's future income and you are each married to the other or Jill receives income from John, Jill has an interest in John's prevailing in the § 727 actions.

But the letter also provided

> that in the event an irreconcilable conflict develops and that Jill's interests in being an unsecured creditor of the bankrupt estate increase or Jill has any other claims against John that evolve, I am free to notify each of you and thereafter continue to represent whichever one of you I so choose without being requested to withdraw by the other.

As the hearing board noted, the May 31 conflict disclosure letter did not mention Quiat's status as a partner in STAPO and limited partner in MMG and did not reveal his personal conflicting interests in that regard. The board also found that the letter did not

---

2. According to 11 U.S.C. § 727 (1994), the court shall grant the debtor in bankruptcy a discharge unless the debtor has committed certain essentially fraudulent acts.

fully explore the possible conflicts of such dual representation or the problems in maintaining the secrets and confidences of both clients if Quiat were to withdraw from representing one of them. The Vanns signed the conflict agreement on June 1, 1989, thus consenting to the dual representation. The board determined that, "[i]n essence, Mrs. Vann agreed to have her interests subordinated to those of Mr. Vann, but the respondent did not advise her to seek the advice of independent counsel before she signed the conflict letter." As Quiat has pointed out, however, the disclosure letter signed by John and Jill Vann recited that, "We have been advised to seek independent representation and counsel as to the nature of these conflicts and how they impact each of us. *We and each of us have sought such independent counsel to whatever extent we and each of us have deemed the same to be advisable.*" (Emphasis added.)

In any event, the hearing board found that Quiat again violated DR 5–101(A) by representing Jill Vann when his judgment could have been affected by his attorney-client and business relationships with John Vann. This was charged in Count III of the complaint. Moreover, Quiat violated DR 5–105(A) and DR 5–105(B) by undertaking and continuing to represent both John and Jill Vann, notwithstanding his disclosures and the consents he obtained because it was obvious he could not adequately represent the interests of each. DR 5–105(A) provided that:

A lawyer shall *decline* proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, *except to the extent permitted under DR 5–105(C).*

(Emphasis added.) DR 5–105(B) stated:

A lawyer shall not *continue* multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in

representing different interests, *except to the extent permitted under DR 5–105(C).*

(Emphasis added.) The exception contained in DR 5–105(C) is as follows:

In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each *and* if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(Emphasis added.)

The hearing board referred to an opinion by United States Bankruptcy Judge Roland J. Brumbaugh, the bankruptcy judge in the Vann bankruptcy, which ordered Quiat to disgorge the attorney fees that Vann paid him relating to the bankruptcy. *See In re Vann,* 128 B.R. 285 (Bankr.D.Colo.1991) (memorandum opinion and order), *aff'd in part and remanded,* 136 B.R. 863 (D.Colo. 1992), *aff'd,* No. 92–1062, 1993 WL 53556 (10th Cir. Feb. 17, 1993). The opinion analyzed the conflicts of interest present in Quiat's multiple representation. With respect to Quiat's representation of both John Vann ("the Debtor") and Jill Vann, the bankruptcy court stated:

[U]nder services rendered to the *Debtor* in connection with the bankruptcy on pages 6 and 7 [of Quiat's Disclosure and Statement of Compensation, Quiat] shows that these services (participation in "global" settlement discussions with the Trustee and creditors) were rendered on April 6, 1989 and June 7, 1989—all at a time when he was advising Jill on the impact of the bankruptcy case on the separation proceedings. In fact, he was working for both parties on the same day, i.e. June 7, 1989. A "global" settlement with the Trustee and creditors would necessarily have meant that Jill's choate, but unvested interests in the marital property would or could be affected and that her interests were not necessarily the same as the Debtor's. The Debtor may very well have been willing to concede more property to the Trustee and creditors in order avoid [sic] a § 523[3] or

---

**3.** Particular debts that survive an order of dis-

charge in bankruptcy are listed in 11 U.S.C.

§ 727 complaint. That would have meant less exempt property upon which Jill could assert her marital property rights directly without having to fight the Trustee and other creditors.

*In re Vann,* 128 B.R. at 288.

Quiat contended at the disciplinary hearing that there was no conflict of interest because the interests of John and Jill Vann were aligned. That is, it was in Jill's best interests for John to emerge from the bankruptcy with as many assets as possible. However, the board determined that Jill Vann's interests were subordinated to those of her husband because John Vann was paying all of Quiat's fees and Quiat's conflict disclosure and waiver purported to allow him to choose which client to continue to represent if an irreconcilable conflict were to arise. The board also pointed out that (1) a lawyer who represented the Vann family in various other matters testified that he had been present at the Vann's residence on two occasions when it was obvious to him that the Vanns had adverse personal and financial interests, (2) Jill Vann had to beg her husband for money, and (3) on the second visit the relationship was "very nasty."

■ On March 5, 1990, Quiat entered his appearance on behalf of Jill Vann and the Vanns' two children in adversary proceeding No. 89C1412. This proceeding involved the validity of John Vann's attempted transfers of his interests in STAPO and MMG to the children. Another lawyer, Peggy E. Stevens, entered her appearance as co-counsel for Jill and the children.[4] Stevens had worked for Quiat in the past as an independent contractor. In the Vann case, Quiat paid Stevens legal fees for the work she performed for Jill Vann and the children.

As he had done before on May 31, 1989, Quiat sent another conflicts disclosure letter to John and Jill Vann on March 23, 1990. This one incorporated the May 31 letter by reference and continued, "In addition to the material discussed in that letter, there is the possibility that the interest(s) of the children could become adverse to the interest(s) of Jill and that these interests may be or are adverse to John."

The bankruptcy court found that Quiat's and Stevens's appearances for the wife, children, and the children's Trust created yet another conflict. *See In re Vann,* 128 B.R. at 290. According to the court, Vann took the position all along that his transfers of interests in STAPO and MMG were effective. The Trustee disputed the validity of the transfers, and sought the return of the partnership interests to the bankruptcy estate. *See id.* It would therefore be in the interests of the children and the children's Trust for the court to uphold the validity of the transfers, while it would be in the interests of the children's mother to void the transfers thereby maximizing the size of the bankruptcy estate which was subject to her claims of marital property. *See id.; see also Stevens,* 883 P.2d at 23. The bankruptcy court continued:

> So we have [Quiat], who represents the Debtor, the Debtor's wife, the Debtor's children, and the children's Trust, Midcontinent [MMG] and Stapo (with fiduciary obligations to Midcontinent and Stapo, and the other limited and general partners, including Mr. Fairchild, a creditor herein), admitting that in his personal opinion the transfers were not effective, yet taking the position on behalf of at least some of his clients that they were effective. And we have Stevens, who represents the Debtor (through contract employment with [Quiat]), who also represents Stapo (and asserts on behalf of that client that the transfers were ineffective), and who now represents the wife and children opposing the Trustee's assertion that the transfers were ineffective when the wife and children have diametrically opposing interests. Truth is stranger than fiction.

§ 523 (1994).

**4.** We publicly censured Peggy Stevens for her multiple representation of STAPO, MMG, John Vann, his wife, and his children in the Vann bankruptcy. *See People v. Stevens,* 883 P.2d 21 (Colo.1994). Because Quiat was not a party to that proceeding, and because the case was resolved on a conditional admission of misconduct between the complainant and Stevens, the facts and conclusions in that case are not binding on Quiat in this case.

*In re Vann,* 128 B.R. at 290. The hearing board agreed with the bankruptcy court's conclusion that Quiat's conflicts disclosures were "totally insufficient," in that they did not detail the potential for conflicts, nor disclose the waiver of attorney-client privilege. As in the May 31 disclosures, Quiat purported to retain the ability to choose whom he would represent if a conflict arose. Finally, the March 23 disclosure did not contain a separate waiver for the children. Although their mother executed it as their guardian, presumably, she had interests adverse to her children.

The hearing board therefore found, with respect to Count IV of the complaint, that Quiat again violated DR 5–105(A) and (B) by undertaking the representation of Jill Vann and her children.

Between May 10, 1989 and March 31, 1990, Quiat received nine payments from John Vann totaling about $124,000 for his services to Vann himself, and $60,000 for his representation of Jill Vann and the children. He did not disclose either the amounts or sources of these payments until specifically ordered to do so by the bankruptcy judge on April 23, 1990. At the time relevant to this case, Fed. R. Bankr.P.2016(b) (1988) [5] provided in relevant part:

**(b) Disclosure of Compensation Paid or Promised to Attorney for Debtor**

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file with the court within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity.... A supplemental statement shall be filed within 15 days after any payment or agreement not previously disclosed.

Quiat had previously filed a disclosure of compensation in July 1989, advising the bankruptcy court that he had a security interest in Vann's deferred compensation ac-

counts, and in the Executive Hanger asset. The disclosure of compensation provided in part as follows:

1. The Debtor has paid and has agreed to pay the Law Offices of Andrew L. Quiat, P.C. for the costs and attorney fees incurred in connection with this case based upon its customary rate for the actual time spent.... [Quiat's] customary fee is $150.00 per hour. [Quiat] may engage the services of another lawyer, not an associate of the firm, Peggy E. Stevens, and share fees with her, according to the services actually performed, at her customary rate of $100.00 per hour. The Debtor has also agreed to pay the costs of the representation, including charges for legal assistants, law clerks and secretaries, photocopies, long distance charges, FAX, mileage and computer research.

. . . .

3. To secure payment for the services described above, the Debtor has given powers of appointment and security interests in proceeds received by the Debtor from the Dean Witter Financial Services, Inc.1986 Capital Accumulation Plan arising from contributions thereto after filing his bankruptcy petition, subject to all applicable court orders, and a security interest in the proceeds of the sale of the Debtor's limited partnership interests in Executive Hangars Number 1, a Colorado limited partnership.

Pertinent to this proceeding, Quiat's July 1989 disclosure of compensation revealed neither the amounts paid by the Debtor, nor the sources of those payments. The complainant in this disciplinary proceeding contended that Quiat disregarded Rule 2016(b) by failing to file statements of compensation within fifteen days after receiving the payments, thereby making misrepresentations by omission and prejudicing the administration of justice. Quiat asserted that he did disclose the charges for his services and costs and that when ordered by the court, he timely filed a disclosure and statement of compensation.

---

**5.** In 1991, Rule 2016(b) was amended to give the United States trustee the information the court received with respect to attorney compensation; the words "with the court" were deleted as un-

necessary. *See* Fed. R. Bankr.P.2016(b) Notes of Advisory Committee on Rules—1991 Amendment (1994).

The hearing board pointed out that, although the bankruptcy court may order a lawyer to disclose the receipt of attorney fees at a time other than when the lawyer was paid, this disclosure does not itself excuse a lawyer's noncompliance with the literal language of the rule. However, the board also noted that all of the bankruptcy experts at the hearing testified that it had been the practice in bankruptcy proceedings, until Judge Brumbaugh's ruling in the Vann bankruptcy, see In re Vann, 128 B.R. at 293, to file statements of compensation not when the fees were paid, but at the end of the case, notwithstanding Rule 2016(b). The hearing board therefore concluded that Quiat did violate DR 7–106(A) (disregarding a standing rule of a tribunal), but "only in a technical sense as it relates to the timing of the filing of his compensation statements." The board found that Quiat did not violate either DR 1–102(A)(4) (conduct involving misrepresentation) or DR 1–102(A)(5) (conduct prejudicial to the administration of justice) by not filing a statement of compensation until he was ordered to, as charged in Count VI[6] of the complaint.

Nevertheless, the board concluded that Quiat violated DR 1–102(A)(4) and DR 1–102(A)(5) by not revealing the sources of the attorney fees he received from the Debtor. Although the complaint did not set out in detail the sources of the attorney fees, Quiat and other witnesses testified and presented considerable documentation on the sources of the fees.

The source of Quiat's fees was particularly relevant since at least some were from pre-petition assets. The board determined that Quiat should have notified the court promptly of his receipt of fees from the disposal of pre-petition assets. The experts agreed that if attorney fees are received from pre-petition assets, that fact must be disclosed at the time the fees are received. Specifically,

> a battle raged as to whether Vann was entitled to an exemption for his deferred compensation account. While the contentious litigation was unfolding, Vann paid the respondent's fees by drawing on the very deferred compensation account at the heart of the dispute. The respondent did not disclose the payments or their source to the court or to the trustee. The board finds that this omission constituted misrepresentation by the respondent and conduct prejudicial to the administration of justice.

Quiat also participated in the sale of a bankruptcy asset, the Executive Hangar, while the bankruptcy was pending. Vann paid him $50,000 from the proceeds of the sale. Neither the sale nor the payment of fees was disclosed to the bankruptcy court or trustee.

When Quiat finally disclosed his fees in detail, it caused a confrontation with Vann's creditors and the trustee. The bankruptcy judge ultimately ordered Quiat to disgorge all of the fees he had been paid because of the unfavorable results he obtained for the Debtor and his various conflicts of interest. See In re Vann, 128 B.R. at 292–93. Quiat appealed the disgorgement order, and it was affirmed. See In re Vann, 128 B.R. 285 (Bankr.D. Colo.1991) (memorandum opinion and order), aff'd in part and remanded, 136 B.R. 863 (D.Colo.1992), aff'd, No. 92–1062, 1993 WL 53556 (10th Cir. Feb. 17, 1993). Quiat reached a settlement of the disgorgement order with the trustee, and his malpractice carrier paid the settlement amount to Vann, who had sued Quiat for malpractice. Vann settled the disgorgement order through a payment. The hearing board found that because of the payment by his malpractice carrier, Quiat was able to retain $141,000 for representing the Vanns.

## II. No. 97SA461

### The Collection Matter

The complaint in Quiat's second disciplinary case charged Quiat with placing repeated telephone calls to an individual's home, speaking with the individual's wife and threatening to sue her husband, indicating that she could lose her house, and that her husband could be held in contempt. These

---

6. The presiding officer of the hearing board granted Quiat's motion for summary judgment with respect to Count V of the complaint; accordingly no evidence was presented to the board on the allegations in that count.

charges grew out of Quiat's attempt to collect fees for legal work he had performed for Heartland Oil & Gas, Inc., a company headed by George C. Jones. Quiat had obtained a judgment in Oklahoma for attorney fees owed to him by Heartland and other defendants, including Jones.

After domesticating this judgment in Colorado, Quiat obtained an ex parte writ of assistance. On March 15, 1994, the district judge signed two orders: Amended Order # 1 and Amended Order # 2. Amended Order # 1 recited that the writ of assistance for collection of Quiat's judgment was "binding upon any and all third persons having actual notice of it." Through discovery in the Heartland matter Quiat became aware of various business dealings that Karl D. Edmunds, a resident of Littleton, had with George Jones. Quiat discovered documents pertaining to Edmunds's involvement with Mountain States and the American Express card, among other matters. On May 2, 1994, Quiat sent a copy of the amended orders to Edmunds by certified mail.

During May and June 1994, Quiat called Edmunds's home at least three times. On each occasion, the telephone was answered by Edmunds's wife, who told Quiat that her husband was not at home. In the first two calls, separated by about two weeks, Quiat "curtly" asked to speak with Mr. Edmunds about a legal matter. When Ms. Edmunds told him that her husband was not at home, Quiat demanded to know how to contact him. Ms. Edmunds gave Quiat her husband's voice mail number and suggested that he leave a message. The hearing board then found:

> During one or more of the telephone calls, the respondent became very angry and told Mrs. Edmunds that her husband could be held in contempt for failing to speak with the respondent. At that time, the respondent was contemplating the initiation of contempt proceedings pursuant to C.R.C.P. 69. However, no such action was possible until Mr. Edmunds had received copies of the amended orders.

When he made the call, Quiat had not verified that the orders had in fact been received by Edmunds. The hearing board continued:

Mrs. Edmunds was very upset by this telephone call, and contacted her husband, who then called the respondent. The respondent told Mr. Edmunds that he could voluntarily cooperate with him or subject himself to more formal proceedings. Mr. Edmunds told the respondent he had never received any orders from Douglas County district court. Immediately after speaking with Mr. Edmunds, the respondent had the amended orders hand-carried to Mr. Edmunds.

Quiat did seek an order of contempt against Edmunds under C.R.C.P. 69, but the court denied the motion as lacking a substantial basis.

The hearing board characterized the issue before it as "whether the respondent's statements to Mrs. Edmunds regarding the contempt citation were dishonest." The board noted that Quiat admitted that in one conversation he told Ms. Edmunds that her husband could be held in contempt, but Quiat stated that he did not convey the possibility in a threatening manner. The board resolved the credibility issue against Quiat, concluding "that the respondent was abrupt with Mrs. Edmunds; that he threatened to pursue contempt proceedings against her husband; and that he failed to advise her that such action was not possible absent notice of the amended orders to Mr. Edmunds."

Because when he spoke with her Quiat had no verification that her husband had notice of the amended orders, "[t]he respondent's statements to Mrs. Edmunds regarding the possibility of contempt were, therefore, dishonest, in violation of C.R.C.P. 241.6(3)." C.R.C.P. 241.6(3) provides that "[a]ny act or omission which violates the highest standards of honesty, justice, or morality" constitutes grounds for lawyer discipline. The board also found that Quiat had engaged in conduct that violated accepted standards of legal ethics, in violation of C.R.C.P. 241.6(2) and Colo. RPC 8.4(g).

### III.

The hearing panel in the bankruptcy matter recommended that Quiat be suspended from the practice of law for six months, with

the requirement that he must petition for reinstatement. The hearing panel in the collection matter approved the findings and recommendation of a second hearing board that Quiat receive a private censure. Quiat has filed exceptions to the hearing panel's actions in both cases. Our standard of review in lawyer discipline cases is well-settled: "[T]his court is bound by the factual findings of the hearing board unless those findings are clearly erroneous and not supported by substantial evidence in the record.... We review questions of law de novo as we would in any appeal." *People v. Reynolds,* 933 P.2d 1295, 1303 (Colo.1997). We first address an issue common to both Count VI of No. 97SA121 and the collection matter.

### A. Notice Under C.R.C.P. 241.12(a)(2)

In both the collection matter and the bankruptcy matter, Quiat contends that certain findings of the hearing board violated procedural due process because the charges for which he was disciplined were not contained within the formal complaint. *In People v. Emeson,* 638 P.2d 293, 294 (Colo.1981), we recognized under a due process rationale that the charges contained in the formal complaint circumscribe the scope of the disciplinary proceedings. *See also In re Chandler,* 161 Ill.2d 459, 204 Ill.Dec. 249, 641 N.E.2d 473, 478 (1994) (stating, "Generally, an attorney may not be disciplined for instances of uncharged misconduct; to do so would violate the respondent's right to procedural due process and our own notions of candor and fairness.").

In the cases before us, we need not reach Quiat's due process contentions because the applicable rule, C.R.C.P. 241.12(a)(2), provides that "[t]he complaint shall set forth clearly and with particularity the grounds for discipline with which the respondent is charged and the conduct of the respondent which gave rise to those charges." We determine that certain findings of the hearing board in both the collection and the bankruptcy matters contravened this rule. We turn first to the collection matter.

The disciplinary complaint in the collection matter alleged that Quiat had made rude and threatening phone calls in violation of disciplinary rules; it did not notify him directly, or by necessary implication, that he should defend himself against a charge of dishonest conduct:

6. Meanwhile, in May or June 1994, respondent called Mr. Edmunds' home approximately six times. These calls occurred during the day, in the evenings and on weekends. On each occasion, respondent spoke with Mr. Edmunds' wife, Beverly Edmunds. According to Ms. Edmunds, respondent was very rude and threatened to sue Mr. Edmunds and told her she could lose her house. Respondent also made other disparaging remarks to Ms. Edmunds regarding her husband.

7. Although Ms. Edmunds gave respondent Mr. Edmunds' office number to leave voice mail messages, he continued to call the house.

8. Respondent violated Rule 8.4(g), C.R.C.P. 241.6(2) and C.R.C.P. 241.6(3) by communicating threats in his letter and telephone calls to the effect that Mr. Edmunds was required to meet with him or a contempt citation would be sought. The placing of repeated telephone calls to Mr. Edmunds' house of a threatening nature was clearly improper especially where Ms. Edmunds requested respondent contact Mr. Edmunds at his office.

Two legal issues were identified for the hearing:

1. Whether the respondent violated R.P.C. 8.4(g), C.R.C.P. 241.6(2) and 241.6(3) by making repeated telephone calls with the threat of suit and repossession of the home of the non-party to the action after the non-party expressed a desire not to be contacted.

2. Whether, as applied herein, Colo. RPC 8.4(g) and C.R.C.P. 241.6(2) and (3) are unconstitutionally vague and over broad and whether the prosecution of this matter violates due process.

Quiat asserted at the hearing that the issues before the board were limited to whether he made repeated threatening telephone calls to Ms. Edmunds. The board disagreed. Citing the text of Colo. RPC 8.4(g) and C.R.C.P. 241.6(2) and (3), the board conclud-

ed that the issue before it was "whether the respondent's statements to Mrs. Edmunds regarding the contempt citation were dishonest."

Resolving the issue of credibility against Quiat, the board found that he "was abrupt with Mrs. Edmunds; that he threatened to pursue contempt proceedings against her husband; and that he failed to advise her that such action was not possible absent notice of the amended orders to Mr. Edmunds." Since when he spoke to Ms. Edmunds he had not verified that her husband had received the amended orders, "[t]he respondent's statements to Mrs. Edmunds regarding the possibility of contempt proceedings were, therefore, dishonest, in violation of C.R.C.P. 241.6(3)."

Under the circumstances of this case we hold that the board's finding that Quiat engaged in dishonest conduct contravened the requirement of C.R.C.P. 241.12(a)(2) that the grounds for discipline be set forth "clearly and with particularity." The complaint and the issues identified for hearing did not adequately place Quiat on notice that he had violated disciplinary rules prohibiting dishonest conduct. A proper charge of dishonesty would have identified conduct constituting violation of Colo. RPC 4.1(a) (making a false statement of material fact or law to a third person) or 8.4(c) (engaging in conduct involving dishonesty, deceit, fraud, or misrepresentation); not 8.4(g) (engaging in conduct violating accepted standards of legal ethics). Accordingly, we conclude that the hearing board erred in finding that Quiat violated the rule against dishonesty.[7]

In the bankruptcy matter, the hearing board concluded that Quiat violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, deceit, fraud, or misrepresentation) and DR 1–102(A)(5) (engaging in conduct prejudicial to the interests of justice); Quiat again contends that these findings violated procedural due process because the charges are not contained within the formal complaint. Again, we determine that our notice rule governed the scope of the hearing board's proceeding.

Count VI of the complaint provided in part as follows:

43. Bankruptcy Rule 2016(b) requires that every attorney for a debtor, whether or not he is required to apply for compensation, file with the court within fifteen days after an order for relief (initial petition and stay order), and within fifteen days after any subsequent payment not previously disclosed, a statement of compensation paid or agreed to be paid.

44. Respondent received nine payments from Mr. Vann totalling [sic] approximately $124,000 between May 10, 1989, and March 31, 1990. Respondent did not disclose any of these payments to the court within the required 15 days, nor did he disclose any payments until specifically ordered to do so by Judge Brumbaugh on April 23, 1990.

45. By failing to disclose the payments for fees as required by court rule, respondent disregarded a standing rule of the tribunal, engaged in conduct prejudicial to the administration of justice, and made misrepresentations by omission.

The complaint charged Quiat with violating the Code of Professional Responsibility because he did not disclose *any* payments until he was ordered to do so, contrary to Rule 2016. The board found that Quiat did *not* violate either DR 1–102(A)(4) or DR 1–102(A)(5) by not filing a statement of compensation until he was ordered to do so. Having absolved Quiat of the charges made, the board should not have proceeded with finding that Quiat committed misconduct in not detailing the *sources* of the income.

### B. *Conflicts of Interest*

Quiat raises the following additional issues in the bankruptcy matter: (1) whether the board's conclusion that Quiat violated DR 1–102(A)(6) was erroneous; (2) whether the

---

7. In No. 97SA461, Quiat also contends that the costs of the proceeding were unreasonable. C.R.C.P. 241.25(d)(1) provides that *if we impose discipline* we may also impose the costs of the disciplinary proceeding on Quiat. Because we have determined that Quiat was not charged with the ethical offense upon which the hearing board made its findings and conclusions against him, we will not require Quiat to pay the costs of proceeding No. 97SA461.

board's findings that Quiat's conflict disclosures were inadequate were clearly erroneous; (3) whether the exercise of Quiat's professional judgment was or could reasonably be affected by his own interests; (4) whether the exercise of Quiat's professional judgment was or reasonably could be affected by his representation of multiple clients; and (5) whether the recommended discipline is unduly harsh. We examine each of these issues in turn.

### 1. Breach of Fiduciary Duties

■ Quiat contends that the hearing board erred when it found, pursuant to Count II, that he engaged in conduct adversely reflecting on his fitness to practice law by placing himself in the position of breaching his fiduciary duties to his other partners in MMG and STAPO. Quiat concedes that he owed a fiduciary duty, including one of loyalty, to his other partners and limited partners in MMG and STAPO. However, Quiat argues that under the specific facts of this case, he did not breach any fiduciary duty nor was such an opportunity likely to arise. The hearing board found that:

> The general partners have a fiduciary relationship with the limited partners. As Vann's counsel, however, the respondent would be attempting to discharge Vann's debts, including his obligations to MMG, thereby increasing the financial exposure of the other limited partners. Doing so would compromise the fiduciary relationship the respondent had with the other partners, even in cases such as this where the assets and liabilities of MMG and STAPO were not substantial.

The central problem with this analysis, according to Quiat, is that there was no debt and no actual financial obligations between the general and limited partners of MMG and STAPO, including Vann and Quiat. Quiat also contends that there was an asset providing income to the partnerships and that all contributions had been made prior to the time Vann filed for bankruptcy. The board apparently accepted these contentions, but stated that "[t]hese circumstances have been taken into account by the board when gauging the seriousness of the conflict, *but*

*they do not undo the violation of the rule itself.*" (Emphasis added.)

The complainant asserts that the hearing board had substantial evidence before it in the testimony of the complainant's expert, Helen Stone, that Quiat had compromised his fiduciary duties to the general and limited partners by his representation of Vann in the bankruptcy. Examining the record closely, however, we agree with Quiat that neither the complainant's expert, nor the hearing board, paid sufficient attention to the specific and unusual facts of MMG and STAPO's actual or potential liabilities. The record does not support the board's finding that an actual conflict existed among the limited and general partners and Vann and Quiat, or that potential for conflict was likely. Thus, we determine that the board erred in concluding that Quiat's representation of Vann constituted conduct adversely reflecting on Quiat's fitness to practice law in violation of DR 1–102(A)(6).

### 2. Representation of Vann (Conflict Disclosures)

■ Quiat next alleges that his conflict disclosures were adequate to obtain informed client consent and that the hearing board's conclusion to the contrary was clearly erroneous. Although Quiat asserts that his discussion pertains as well to Count III of the complaint, his argument is confined to the board's findings as to Count I, and we limit our analysis accordingly.

In Count I, the hearing board found that Quiat violated DR 5–101(A) when he represented Vann in the bankruptcy at the same time he had a business relationship with Vann both as a limited partner in MMG and as a general partner in STAPO. The board also found that, because Quiat's waiver of conflict letter to Vann did not mention these business relationships, the disclosure was incomplete and Vann's waiver of conflicts was ineffective.

Quiat acknowledges that his waiver of conflict letter did not mention his business relationships with Vann, but asserts that he orally discussed those matters with Vann. The complainant's response relates almost entirely to the ineffectiveness of the conflict waiv-

ers as between Quiat and Mr. and Mrs. Vann and the Vann children. The complainant does not specifically address Quiat's contention that the waiver of conflict between Vann and Quiat was effective because Vann had in fact been advised of the possibility of conflicts arising from Vann's and Quiat's business interests together.

Quiat points to an affidavit signed by Vann as evidence that he and Vann did discuss potential conflicts arising from their mutual business interests. The affidavit is neither as detailed, nor as compelling, as Quiat suggests. We accept the hearing board's conclusion that Quiat's disclosures of possible conflicts to Vann were insufficient.

### 3. Representation of Vann (DR 5–101(A))

■ Because of his relationships with MMG, STAPO, and Vann, Quiat asserts that he did not violate DR 5–101(A) with respect to his representation of Vann in the bankruptcy. His argument is similar to the one he made in Issue 1 above. He contends that because neither MMG nor STAPO, nor any of the partners or limited partners, including Quiat himself, were creditors of Vann (because Vann had made all of his required contributions to MMG and STAPO) there was no actual or potential differing interests between Quiat and Vann. DR 5–101(A) provides, "Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

We have determined that the board did not err in finding that the disclosure was inadequate. Our analysis does not end with this, however. In order for Quiat to have violated DR 5–101(A), it must be proven by clear and convincing evidence that "his professional judgment will be or reasonably may be affected by his own financial, business, property, or personal interests." We agree with Quiat that the record does not support the conclusion that Quiat's business relationship with Vann would or reasonably might affect his professional judgment with respect to his representation of Vann.

### 4. Representation of John and Jill Vann

■ In Count III, the board found that Quiat violated DR 5–105(A) and DR 5–105(B) by undertaking and continuing to represent both John and Jill Vann, notwithstanding his disclosures and the consents he obtained, because it is obvious he could not adequately represent the interests of each. In Count IV, the hearing board found that Quiat again violated DR 5–105(A) and (B) by undertaking the representation of Jill Vann and her children. Quiat asserts that these findings were erroneous because it was not likely that the Vanns' interests were or would become adverse so as to create a conflict in his judgment or loyalty.

The hearing board found otherwise, as did the bankruptcy judge. In essence, the board determined that the interests of Jill and John Vann were so adverse, or potentially adverse, that the conflicts could not be waived even had there been full disclosure. DR 5–105(A) provides that "[a] lawyer *shall decline* proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, *except to the extent permitted under DR 5–105(C)*." (Emphasis added.) DR 5–105(B) states that "[a] lawyer *shall not continue* multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing different interests, *except to the extent permitted under DR 5–105(C)*." (Emphasis added.)

The exception is contained in DR 5–105(C):

In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each *and* if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(Emphasis added.) The board concluded that it was not obvious that Quiat could represent both John and Jill Vann as well as the children. This conclusion is also supported by the testimony of the complainant's expert, Helen Stone. The level of actual animosity between the parties was disputed at the hearing, and the hearing board's finding that it was "very nasty" is not clearly erroneous. We therefore determine that the hearing board's findings were not erroneous that Quiat violated DR 5–105(A) and (B) with respect to his multiple representation of John and Jill Vann, and their children.

## IV.

### Summary of Holdings and Level of Discipline

Because we have set aside several of the hearing board's findings as a matter of law, we agree with Quiat's contention that the level of discipline recommended by the hearing panel, a six-month suspension with the requirement of reinstatement proceedings, is overly harsh. To summarize our review, we conclude that the board in the collection matter found misconduct that was not charged adequately in the complaint against Quiat.

■ In regard to the bankruptcy matter, with respect to Count I, we conclude that Quiat did not violate DR 5–101(A) (accepting employment when the lawyer's professional judgment may be affected by his own interests). However, Quiat did violate DR 5–101(B) (accepting employment if the lawyer knows or it is obvious that the lawyer should be called as a witness). When he accepted employment, Quiat knew that he could be a witness by virtue of his interests in MMG and STAPO, these being assets of the bankruptcy estate, and Quiat's failure to transfer the partnerships' interests to Vann's children prior to the filing of the bankruptcy.

We conclude, however, that Quiat did not violate DR 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice) as charged in Count II. We sustain the board's findings that Quiat violated DR 5–105(A) and (B) as alleged in Counts III and IV. Finally, we hold that the board should not have found that Quiat violated DR 1–102(A)(4) (engaging in conduct involving dishonesty) and DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice) because the hearing board absolved him of the charges the complaint called him to defend.

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ), in the absence of aggravating or mitigating factors, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA *Standards* 4.32. On the other hand, public censure is warranted if the lawyer is at most "negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client." *Id.* at 4.33. Consistent with the hearing board's findings, Quiat *knew* of the conflicts involved when he undertook to represent John and Jill Vann and the Vann children. Thus, a period of suspension should be imposed.

Quiat has been disciplined before; this is an aggravating factor for determining the proper level of discipline in this case. *See id.* at 9.22(a). He received a private censure in 1992 for charging a clearly excessive fee. Additional aggravating factors include Quiat's dishonest or selfish attitude, *see id.* at 9.22(b); a pattern of misconduct, *see id.* at 9.22(c); his refusal to acknowledge the wrongfulness of his conduct, *see id.* at 9.22(g); the vulnerability of Jill Vann and her children during Quiat's representation of them, *see id.* at 9.22(h); and Quiat's substantial experience in the practice of law, *see id.* at 9.22(i).

In mitigation, the board found that, at the time of misconduct, Quiat was experiencing personal problems, *see id.* at 9.32(c); he cooperated during the disciplinary proceedings, *see id.* at 9.32(e); he has a good character and reputation in the community, *see id.* at 9.32(g); and there has been substantial delay in these disciplinary proceedings, *see id.* at 9.32(i).

■ Taking these considerations into account, we determine that a short period of suspension is warranted, but not the requirement of reinstatement proceedings. This is consistent with the level of discipline accorded to Peggy Stevens, a public censure, *see People v. Stevens*, 883 P.2d 21, 24 (Colo. 1994), in comparison to Quiat's more serious involvement and responsibility in the bankruptcy case. Although we would normally select a thirty-day period of suspension, this is not the usual case. We believe that Quiat's failure to appreciate and understand the wrongfulness of his conduct mandate a longer suspension. Three months is appropriate. Accordingly, we dismiss the complaint in No. 97SA461, the collection matter, and order that Quiat be suspended from the practice of law for three months for his misconduct in No. 97SA121, the bankruptcy matter.

## V.

We order that Andrew L. Quiat be suspended from the practice of law for three months, effective thirty days after the issuance of this opinion. We also order Quiat to pay the costs of No. 97SA121 in the amount of $8,231.32 within ninety days after this opinion is announced to the Attorney Regulation Committee, 600 Seventeenth Street, Suite 200 South, Denver, Colorado 80202–5432.

JUSTICE SCOTT does not participate.